## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DAWN RICHARDSON, <br><br> Plaintiff, <br><br> v. <br><br> HOMETOWN HOSPICE, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No: _____ <br><br> **FILED UNDER SEAL** <br><br> **DO NOT PLACE IN PRESS BOX** <br> **DO NOT ENTER ON PACER** <br><br> **DEMAND FOR JURY** |

### *QUI TAM* COMPLAINT

Plaintiff-Relator Dawn Richardson, on behalf of herself and the United States of America, alleges and claims against Hometown Hospice, Inc., as follows:

### JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the State of Alabama, transacts substantial business in the State of Alabama, transacts substantial business in this judicial district, and can be found here. Additionally, and as described herein,

Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, and *inter alia*, Defendant submitted and caused to be submitted within this judicial district false claims for hospice care for ineligible patients and false claims for palliative care which should have been paid for by Defendant, and made or used false records material to get such claims paid.

## PARTIES

3.     Defendant Hometown Hospice, Inc. ("Hometown Hospice") is a Medicare-certified hospice provider offering hospice services in several south-Alabama counties from its locations in Jackson and Camden, Alabama.  Through her experience as a Hometown Hospice Clinical Manager, Plaintiff-Relator has learned that Defendant conducts its hospice operations with the fraudulent intent to defraud the United States by billing for ineligible hospice patients and by avoiding the cost of palliative care for legitimate hospice patients.

4.     Plaintiff-Relator Dawn Richardson is a registered nurse with 16 years of experience as a Hospice care-giver and manager.  Ms. Richardson was employed as a Clinical Manager by Hometown Hospice in September, 2010. Since that time, Ms. Richardson has witnessed countless instances of knowing, willful fraud committed by Hometown Hospice with the intent of falsely inflating Medicare billing and illegally shifting costs onto the Medicare program. Specifically, Ms. Richardson has become personally familiar with Defendant's

practices of paying illicit bonuses to clinical staff in exchange for patient referrals; of admitting and billing for non-terminal, ineligible hospice patients; and of fraudulently eliciting and backdating hospice revocations from patients who require expensive palliative procedures that should be paid for by Defendant.

5.     Through her experience, Plaintiff-Relator has witnessed so many instances of fraud as to believe that Defendant's fraudulent tactics are widespread, systematic practices endemic to Defendant.   Defendant's fraudulent conduct offends Plaintiff-Relator's long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and causes her to file this Complaint on behalf of herself and the United States as a relator under the *qui tam* provisions of the False Claims Act.

6.     Prior to filing this Complaint, Plaintiff-Relator voluntarily disclosed to the Government the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Plaintiff-Relator is the original source of the information for purposes of that Section.   Alternatively, Plaintiff-Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Plaintiff-Relator voluntarily provided that information to the Government before filing this Complaint. Plaintiff-Relator is serving contemporaneously herewith a

statement of the material evidence in her possession upon which her claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I.    Background

7.    Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

8.    Through the Medicare Hospice Benefit (Hospice), Medicare pays for hospice care for certain terminally-ill patients who elect to receive such care.  *See* 42 U.S.C. § 1395d.  A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."  42 C.F.R. § 418.3.  In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment.  *See* 42 U.S.C. § 1395d.  A patient may at anytime revoke his or her hospice election and resume Medicare Part A coverage.  42 C.F.R. § 418.28.

9.    Defendant's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.  The impetus for the modern hospice

4

movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally ill.  In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients.   Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home."   In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986 ("Hospice").  By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

10.    From such humble, altruistic roots, Hospice has become big business. Medicare Hospice payments rose from $205 million in 1989 to $9.2 billion in 2006.   In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that Hospice

represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

11.     Leslie Norwalk, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home."   Nevertheless, Defendant and other for-profit Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

## II.   Hospice Benefits, Reimbursements, and Requirements

12.     Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician.   *See* 42 C.F.R. § 418.22.   Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.    Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

6

13.     Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302.  Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.   Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

14.     In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services.   *See* 42 C.F.R. § 418.202. The hospice must design a plan of care inclusive of all covered services necessary to meet the patient's needs. *See* 42 C.F.R. § 418.56.  Among other services, every hospice must provide short-term inpatient care for pain-control and symptom-management related to the patient's terminal illness.  *Id.*; *see also* 42 C.F.R. § 418.108.

15.     Medicare will not pay for hospice services provided to patients who are not terminally ill.  *See* 42 U.S.C. §1395y.   Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et*

*seq.*; 42 C.F.R. § 410.50.  Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

16.    Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services.  *See* 42 U.S.C. 1395ff. Accordingly, Medicare Hospice MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and limitations on Hospice coverage.  *See, e.g.,* LCDs Published by Palmetto GBA, Alabama Home Health/Hospice FI, *available at:*

http://www.cms.gov/mcd/results_index.asp?from='lmrpstate'&contractor=88&name=Palmetto+GBA+%2800380%2C+RHHI%29&letter_range=4.    Medicare will not pay for hospice care provided to a patient who does not meet LCDs. *See* 42 U.S.C. 1395y.

17.    To enroll as a Medicare providers, Defendant was required to submit a Medicare Enrollment Application for Institutional Providers.  *See* CMS Form 855A.  In submitting Form 855A, Defendant made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand

> that payment of a claim by Medicare is conditioned upon
> the claim and the underlying transaction complying with
> such laws, regulations, and program instructions
> (including, but not limited to, the Federal Anti-Kickback
> statute and the Stark law), and on the provider's
> compliance with all applicable conditions of participation
> in Medicare.

Form CMS-855A.

18.     Defendant then billed Medicare by submitting a claim form (CMS Form 1450) to the FI responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450.  Each time it submitted a claim to the United States through the FI, Defendant certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

19.     Defendant thus certified that each claim for a hospice *per diem* payment represented a day of care provided to a terminally ill patient, and CMS expressly conditioned its payment on the truth and accuracy of that certification. Defendant further certified that its programs were in compliance with Medicare regulations, including the requirement that Defendant provide short-term in patient care related to its patients' terminal conditions.

## III.   THE ANTI-KICKBACK STATUTE

20.     The Medicare and Medicaid Patient Protection Act of 1987, as amended and codified at 42 U.S.C. §1320a-7b (the "Anti-kickback Statute" or "AKS"), provides as follows:

9

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

The provisions of the Patient Protection and Affordable Care Act, Publ. L No. I 11-148, 124 Stat.119 § 6402(f)(1) (2010) ("PPACA"), adopted on March 23, 2010, provide that: "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes of [the False Claims Act]."

21.  At all times relevant to this complaint, compliance with the AKS was a condition of participation for a health care provider in the Medicare program. Moreover, compliance with the AKS is a condition of payment for claims made to Medicare for reimbursement for services, including Hospice services.

## DEFENDANT'S FRAUDULENT SCHEMES

**I.  Billing for Ineligible Hospice Patients**

22.    Defendant systematically defrauds Medicare and Medicaid by recruiting and cycling non-qualifying patients through its Hospice program.

23.    Defendant actively recruits, certifies, and bills the United States through CMS for ineligible patients.  Defendant perpetrates its scheme by paying illicit referral bonuses to staff as described in detail below, by deliberately under-training clinical staff to keep them in ignorance of Hospice eligibility requirements, and by employing non-qualified staff to perform patient assessments and admissions.  Hometown Hospice Administrator Liz Ann Pezent (Pezent) sees to it that nearly every patient referred to Defendant is admitted, regardless of eligibility, often resorting to sending Licensed Practical Nurses (LPNs) on staff to assess and admit patients who have been rejected as ineligible by Defendant's Registered Nurses (RNs), as described *infra*.

24.    In violation of Medicare Conditions of Participation, *see, e.g.,* 42 C.F.R. § 418.58, Defendant's owners and managers encourage ignorance among clinical staff so as to more easily coerce them into admitting ineligible patients.  In or around September, 2010, Pezent overheard Plaintiff-Relator Richardson – a Clinical Manager – instructing nurses on Hospice eligibility requirements; Pezent rebuked Ms. Richardson and admonished her, "the less said, the better."

25.    Pezent also instructs Hometown Hospice nurses to "chart negative" – that is, to falsify assessments and nursing notes to create the fraudulent appearance

that the patients are terminal and are in decline.  On or about September 8, 2010, on Ms. Richardson's first day as Clinical Manager, Pezent told Richardson, "I am always preaching to the staff to 'chart negative' – never chart that the patient is doing good [sic]."

26.     The result of Defendant's practices is that many of its patients do not qualify for Hospice and are falsely billed to the United States.  The vast majority of patients currently on the rolls of Defendant's Camden location, under the supervision of Plaintiff-Relator, are non-terminal and ineligible for Hospice.

27.     The following are merely a representative example of   the   recent results of Defendant's fraudulent practices; these patients' conditions belie a terminal diagnosis and do not comport with LCDs, yet they have been fraudulently certified by Defendant as terminally-ill and falsely billed to the United States through CMS:

a.      Patient B.P. was admitted by Defendant on or about March 9, 2009, under a diagnosis of Alzheimer's Disease.  B.P. lives alone, can perform many activities unassisted, and can carry on a full conversation.  On or about October 2, 2010, B.P. was discharged for "extended prognosis."

b.      Patient R.M. was admitted on or about September 15, 2010 under a heart disease diagnosis.  R.M. reports no chest pain, shortness of

breath, edema, or fatigue.  In fact, R.M. ambulates without difficulty, cooks, cleans, babysits her grandchildren, works in her yard, and cares for her daughter, A.D. – who is also on Defendant's service.[1]  A.D. is obese and exhibits occasional edema and shortness of breath due to that condition, but she shows no decline and is not terminal.

c.   Patient P.L.F. and his wife, M.F., were both admitted on or around July 26, 2010 under diagnoses of heart disease.   P.L.F. has no symptoms of heart disease and currently runs his own goat farm.

d.   Patient N.W. was admitted on or about September 25, 2009 under a diagnosis of congestive heart failure.  N.W. has no shortness of breath or edema.   In September, 2010, Hometown Hospice nurse Diane Hoven told Plaintiff-Relator, "I don't know why we have [N.W.] on the program."

e.   Patient J.S. was admitted on or about June 29, 2010 under a diagnosis of prostate cancer.  Because his medical history showed no definitive evidence of cancer, Defendant simply changed his diagnosis to heart disease.  J.S. does not display the symptoms of terminal heart disease and is not terminally-ill.

---

[1] Many of Defendant's patients are related and living in the same household.  Upon receiving a referral, Defendant seemingly makes it a practice to admit anyone in the vicinity who is Medicare-eligible.

13

f.   Patient I.J. was admitted on or about June 29, 2010, under a diagnosis of prostate cancer.  I.J.'s chart shows that he was diagnosed with cancer in 1994, underwent surgery, and shows no signs of cancer since that time.  I.J. rides the bus to the senior center every morning and spends the day socializing; his chart shows numerous missed nursing visits due to his frequent absences from home.

## II.   Ordering Patient Assessments by Unqualified Personnel and Providing Service under Inadequate Plans of Care

28.   In violation of Medicare regulations, Defendant deliberately employs unqualified staff to perform patient assessments and to admit patients and systematically fails to adopt adequate patient care plans.  As a result, Defendant's patients are deprived of care.

29.   As outlined above, participation in the Hospice program requires Defendant to provide patients with all necessary palliative care related to their hospice diagnosis and to design a plan of care to meet the patients' needs.  *See, e.g.,* 42 C.F.R. § 418.54; 418.56.  Initial patient assessments and 14-day periodic patient assessments must be performed by RNs. *See* 42 C.F.R. § 418.54.

30.   In violation of Medicare regulations, and with the dual intent of cutting cost and avoiding the Medicare-eligibility constraints, Defendant routinely sends LPNs to perform patient assessments.  LPNs are not qualified to assess a patient's care needs and to design an adequate care plan meeting the palliative-care

requirements of the patient. *See* 42 C.F.R. § 418.54.  LPN Dana Young (Young) told Plaintiff-Relator on September 8, 2010, that Young regularly performs assessments and admits patients at the behest of Pezent "even though she [Young] is not supposed to."  Later, Clinical Manager Debbie Jackson (Jackson) informed Plaintiff-Relator that Pezent sent Young to admit a patient that Jackson had rejected as ineligible for Hospice.

31.    In fact, Defendant has a blanket policy of operating without Medicare-mandated plans of care, in violation of 42 C.F.R. § 418.56.  When Plaintiff-Relator began employment with Hometown Hospice, Pezent frankly informed her that Defendant's patient care decisions are not actually tied to patient acuity or care needs; Defendant simply provides two nursing visits and to nursing-aide visits per week, regardless of a patient's condition or requirements. Plaintiff-Relator's experience confirms that Defendant consistently submits false claims to Medicare for patient services rendered without a true patient assessment or a legitimate comprehensive care plan.

### III.    Providing Illicit Referral Bonuses to All Staff

32.    Defendant violates the AKS and the False Claims Act by offering and paying per-patient, per-referral remuneration to staff in the form of "referral bonuses."

33.    In June, 2010, Defendant issued a bulletin reading "ATTENTION ALL EMPLOYEES!!! . . . REFERRAL BONUS TIME!" *See* **Exhibit A**.  Under the offer, any Hometown Hospice employee who refers a patient receives $500 dollars in return.  An employee who makes five referrals gets the cash plus five extra vacation days.  10 referrals nets 10 days of vacation.

34.    The referral bonus blatantly constitutes remuneration in exchange for referrals and under the AKS.  The $500 payment is not tied to any "employment for the provision of covered services" – it is simply cash for a referral – and thus no safe harbor applies.  Defendant's practice violates the AKS and renders its claims to the United States false.

### IV.    Eliciting and Backdating Fraudulent Revocations for Legitimate Hospice Patients who Require Hospitalization for Palliative Care

35.    Defendant fraudulently increases its profits and shifts costs to the United States through a pattern and practice of fraudulently "revocating" legitimate Hospice patients who require expensive palliative hospital care and "backdating" paperwork to evade responsibility for costly procedures. Defendant effectuates its scheme through wholesale forgery of revocation forms; upon admission of each patient, Defendant's staff is instructed to obtain a signed, undated revocation form. When the patient is admitted to the hospital for expensive treatment, Defendant falsely dates the form and files it, as though the patient has made a revocation of his or her hospice benefit.

36.     Hospice requires that Defendant bear any costs for palliative care that exceed the standard per-diem amount. *See* 42 C.F.R. §§ 418.56; 418.108; 418.202. The *per-diem* rate paid by the United States to Defendant, however, is generally much less than the actual per-diem cost of even a routine hospital stay for palliative treatment.    Unwilling to absorb such high costs of hospital care, Defendant fraudulently shifts these costs to the United States through false revocations.    In order to boost its profit margin, Defendant creates the false appearance of a hospice revocation by dating and filing the revocation form it obtained upon the patient's admission.

37.     When patients are hospitalized without notice to Defendant and undergo expensive procedures before Defendant can fraudulently "revocate" the patient, Defendant simply "backdates" the revocation form so that the revocation appears to have taken place prior to the hospital stay.   The cost of care which should be borne by Defendant is then borne by the United States through Medicare Part A or Medicaid; as a result of the scheme, the United States pays a full Medicare fee-per-service rate for care that it has already paid for at the lower Hospice per-diem rate.

38.     By and through all of the circumstances described, *supra*, Defendant has violated the healthcare laws and regulations of the United States, undermined

the noble intention and mission of Hospice, defrauded the United States of America, and jeopardized the already strained Medicare program.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729

39.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

40.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –  presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)    Defendant submitted false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b)    Defendant submitted false claims for Hospice care provided to patients who were not properly assessed by an RN and in the absence of a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c)   Through fraudulent revocations, Defendant caused hospitals and other healthcare providers to submit false claims under Medicare Part A or Medicaid for

care that should have been paid for by Defendant by reason of its obligations as Medicare hospice providers under 42 C.F.R. §§ 418.201, *inter alia*.

(d)   Defendant submitted false claims for Hospice resulting from violations of the AKS in the form of illicit referral bonuses;

(e)   Defendant submitted false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

41.   The United States paid the false claims described herein and summarized in paragraph 40(a)-(e).

42.   Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

43.   Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendant, in an amount equal to treble the

damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

44.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

45.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)    Defendant created and used false certifications of terminal illness; false patient care plans not calculated to cope with patients' actual needs and conditions; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)    Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A

and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to the AKS, 42 U.S.C. §1395y, and the applicable LCDs.

(c)   Defendant made or used or caused to be made or used fraudulent revocation forms intended to create the false appearance that patients required and elected to receive aggressive curative treatment when in fact the patients never truly revoked their hospice election, the treatment required was palliative in nature and should have been paid for by Defendant pursuant to *See* 42 C.F.R. §§418.201; 418.56, *inter alia*, or both;

46.   The false records or statements described herein and summarized in paragraph 45 (a)-(c) were material to the false claims submitted or caused to be submitted by Defendant to the United States.

47.   In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

48.   Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendant, in an amount equal to treble the

damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

**COUNT THREE**
**"REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)**

49.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

50.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

(a)    Defendant knew that it had received millions of dollars in Hospice *per diem* payments for patients who did not qualify for Hospice, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

(b)    Defendant knew that the United States had paid millions of dollars for palliative hospital in-patient treatment that should have been paid for by Defendant, yet Defendant took no action to satisfy its obligations to the United

States to repay or refund those payments and instead retained the funds and continued to bill the United States;

51.    As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FOUR
## FRADULENT INDUCEMENT UNDER 31 U.S.C. § 3729

52.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

53.    By and through the actions described herein, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent claims, to wit:  Defendant fraudulently induced the United States to pay per-patient *per-diem* fees for patient care that Defendant never intended to provide.

54.    Through submission of CMS Form 855A and otherwise, Defendant agreed to provide care to patients in return for a per-patient *per-diem* payment from the United States through CMS.  By regulation, including 42 C.F.R. § 418.201,

United States made it clear that such per-patient *per-diem* payments were consideration for Defendant's agreement to provide ongoing, complete palliative patient care; and Defendant's agreement to provide such ongoing, complete palliative care was – in fact – a condition of the United States' per-patient *per-diem* payments to Defendant.

55. At the time that Defendant requested and accepted the per-patient *per-diem* payments, it intended to avoid the high costs of palliative-care procedures and medications by using false documents to create the appearance that patients had temporarily revoked their Hospice election, in order that such expensive procedures should be billed under Medicare Part A. In fact, Defendant created the false documents at the moment it admitted each patient.

56. Accordingly, the United States was misled by Defendant's material misrepresentation that it would provide palliative care for such patients, which Defendant ultimately avoided through fraudulent revocation. In many instances, after the expensive procedures were completed the patients were fraudulently re-certified for Hospice.

57. By and through the actions described *supra*, Defendant knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent revocation documents and back-dated revocation records and false claims for payment to the United States related to the per-patient

*per-diem* claims for payment. Such false records or statements were used by Defendant to get false or fraudulent claims paid or approved by the United States.

58.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the payments made to Defendant and others by the United States through Medicare for all patients whose hospice election was fraudulently revoked.

WHEREFORE, Plaintiff-Relator requests entry of judgment in her favor on behalf of the United States and against Defendant in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FIVE
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

59.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

60.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendant knowingly certified and/or re-certified Hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

61.    The United States paid Defendant for such false claims.

62.    Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

63.    Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

64.    Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FIVE
## SUPPRESSION, FRAUD, AND DECEIT

65.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

66.    Defendant misrepresented or suppressed the material facts that (1) a substantial number of its patients enrolled in Hospice do not qualify for Hospice and are not terminally ill and (2) Defendant created and submitted numerous false revocation forms for patients who never made a true revocation of their Hospice election and who in fact required only palliative care.

67.    Defendant was legally obligated to communicate these facts to the United States.

68.    Such misrepresentations were made willfully to deceive or recklessly without knowledge.

69.    The United States acted on Defendant's material misrepresentations described herein to its detriment.

70.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States as a result of Defendant's fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States and against Defendant pursuant to 31 U.S.C. § 3732 and Ala. Code §§ 6-5-101, 6-5-102, and 6-5-103 in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such

conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relator may be entitled.

Date:  December 3, 2010.

HENRY I FROHSIN
JAMES F. BARGER, JR.
J. ELLIOTT WALTHALL

Attorneys for Plaintiff-Relator
Dawn Richardson

**OF COUNSEL**
FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:   205.933.4006
Fax:   205.933.4008

**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

## NOTICE OF COMPLIANCE

On this the 3rd day of December, 2010, Plaintiff-Relator hereby certifies that

in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the

*Qui Tam* Complaint has been executed as follows:

**By Certified Mail to:**

United States Attorney Kenyen R. Brown
Attn:  AUSA Deidre Colson
63 South Royal Street
Suite 600
Mobile, Alabama 36602

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

# EXHIBIT  A



**P.O. Box 403**
**1447 College Avenue**
**Jackson, AL 36545**
**Phone: 251-246-2727**
**Fax: 251-246-2276**

# ATTENTION ALL EMPLOYEES!!!

# Beginning June 9, 2010

# REFERRAL BONUS TIME!

# $500.00 for Patient referrals that meet criteria

# Following page has the criterion that has to be met for payment to be received.

# Refer 5 patients, bonus PLUS 5 extra days vacation.

# Refer 10 patients, bonus PLUS 10 extra days vacation.

# *Bonuses will be paid on July 29, 2010 And October 7, 2010; this will enable verification of payment from Medicare.*



# Patient Referral Requirements

**For an employee to receive a bonus, the following MUST be completed:**

- **Discuss hospice with patient and/or caregiver.**
- **Have pt/cg call physician and ask for H.H. to evaluate.**
- **Physician order MUST be received before evaluation can be done.**
- **Patient must NEVER have had hospice before.**
- **SSN must be on form so verification can be made that pt has never had hospice.**
- **Medicare number must be on form.**
- **Patient MUST have Medicare to count toward CAP.**
- **Payment MUST be approved by management.**
- **All BOLD areas MUST be complete on form.**

**This is a bonus for employees and must not be discussed outside the office.  You are appreciated for your services to this company!  Please continue to promote Hometown Hospice!**



# EMPLOYEE PATIENT REFERRAL BONUS FORM

**Patient Name:** _____

**SSN:** _____-_____-_____   **DOB:** _____   **Age:** ____

**Address:** _____
         (City)              (State)    (Zip)          (County)

Race: _____   Sex: _____   **Phone:** _____

**Caregiver/Contact:** _____

**Primary Physician:** _____

**Diagnosis/Co-morbids:** _____

_____

_____

_____

**\*BOLD areas MUST be complete**

I have discussed hospice with this patient/family and have gathered the above information as a referral to Hometown Hospice.

_____       _____
Employee Signature                                     Date

Patient Admitted : Yes _____      No _____